Willie FOULKS, Appellant,

v.

STATE of Indiana, Appellee.

No. 71S00–9007–CR–465.

Supreme Court of Indiana.

Dec. 11, 1991.

Brian May, South Bend, for appellant.

Linley E. Pearson, Atty. Gen. of Indiana and Mary Dreyer, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Justice.

A jury trial resulted in the conviction of appellant of two counts of Murder, for which he received sentences of sixty (60) and fifty (50) years, and one count of Attempted Murder, for which he received a sentence of fifty (50) years, all sentences to run consecutively.

The facts are: On March 22, 1986, Kimberly Whitlock went to the home of Johnny Griffin, one of the victims in this case, to purchase drugs. Bernard Bibbs, the other murder victim in this case, was also at the Griffin home. While Whitlock was there, appellant and Terrance Lee came, and before they entered, Griffin directed Whitlock to go to an adjoining bedroom and close the door.

She stated that she sat in the bedroom and watched television for a long period of time, then suddenly she heard struggling and the breaking of furniture. She heard someone say, "Get Bibbs, man." She also heard several gunshots. Appellant then came into the bedroom carrying a large gun, looked at her, laughed and said, "Where is it at?" She told appellant she did not know what he was talking about. She then heard Griffin talking, and appellant hurriedly walked from the room. She heard Griffin call Bibbs to help him and begged appellant for his life. He also asked Whitlock to call the police. Appellant told Lee to watch Whitlock and make sure she did not call the police.

Lee then came to the door with a gun and pointed it at Whitlock. Lee asked her where the cocaine was, then appellant told Lee to watch the front door and make sure no one came in the house. She heard Griffin tell appellant, "Come in, Bill, be cool man. You know I have always done you right." Appellant kept asking, "Where's it at, man?" Griffin kept calling on Bibbs and Whitlock to help him. After a while, Whitlock heard Lee say, "I got it man." She assumed Lee meant he found the cocaine. Appellant then directed Lee to bring Whitlock to him. As Whitlock walked through the den, she stepped over Bibbs, who was lying on the floor with a lot of blood around his head. Lee then led Whitlock through the living room past appellant and Griffin.

Whitlock saw appellant holding Griffin by his shirt collar and pistol whipping him. She walked past them into the dining area where Lee followed her. She asked Lee if she could leave, that she did not know anything. Lee told her, "Girl, you better be quiet before Bill gets mad." Whitlock witnessed appellant beating Griffin repeatedly in the head with the gun for over an hour. The gun was arm's-length in size. Every time appellant hit Griffin, Whitlock saw blood splash. Appellant stopped and rested three times during the beatings. During his rest periods, appellant would breathe heavily as if he had been running.

In the meantime, Lee made Whitlock stand against the wall, and at times, he would target practice on her. After appellant had rested for the second time, he went to the kitchen and came back with a knife. He then stabbed Griffin in the head. Appellant then told Whitlock, "Kim, you got a problem?" Then he directed Lee to shoot her. As Whitlock sat on the floor, Lee opened fire. Appellant beat Whitlock with the gun he used on Griffin. One of the blows severed the tip of her left index finger. Whitlock then played dead, and she heard one of the men say, "Man, she's gone," and they left the house.

After they had gone, Whitlock was able to go to her mother's home. The police eventually were called, and it was discovered that in addition to the severed finger, Whitlock had two gunshot wounds to the left side of the head and four other gunshot wounds to her ankles and feet. Both decedents suffered superficial and severe wounds. Bibbs eventually was killed by a gunshot wound which severed his brain stem and Griffin died of multiple bludgeoning and stab wounds, one of which caused severe internal chest bleeding which alone was enough to cause death.

Appellant claims the trial court erred in permitting in evidence State's Exhibit No. 2(A), which was a knife found in appellant's truck and was determined to have bloodstains matching Griffin's blood type and a fingerprint of appellant. Appellant also claims the court erred in permitting State's Exhibits Nos. 45 and 46, which were photographs of the knife in question. Appellant contends the exhibits were inadmissible because the knife was obtained by an illegal search of his truck.

Following the killing, and after interviewing Whitlock, the police had obtained a warrant for appellant's arrest. When they observed the truck, which they knew to belong to appellant, it was stopped. However, the driver claimed that appellant had given him the truck to use. The police later discovered that appellant in fact had fled to Detroit, Michigan where he was apprehended some three years after the crimes described above had been committed.

Under the circumstances, the police impounded appellant's truck, and after taking it to the police garage attendant, they conducted an inventory search during which the knife was discovered. Following the discovery of the knife, the photographs in question were taken.

■ Appellant claims the police were not justified in impounding his truck because he was not the driver and that he was not in custody when the search was conducted. We repeatedly have stated that police officers are justified in conducting inventory searches of vehicles without obtaining a search warrant. *See e.g. Freeman v. State* (1989), Ind., 541 N.E.2d 533; *Deneal v. State* (1984), Ind., 468 N.E.2d 1029. We have set forth three reasons to conduct such a search: 1) protection of private property in police custody; 2) protection of the police from claims over lost or stolen property; and 3) protection of police from potential danger. *See Rabadi v. State* (1989), Ind., 541 N.E.2d 271.

In the case at bar, the police had a warrant for appellant's arrest but could not find him. They certainly were justified in impounding a truck known to belong to him, and in fact, had a duty to conduct an inventory search following the impoundment. We see no reversible error in the admission of the questioned exhibits.

■ Appellant contends the trial court erred in permitting in evidence State's Exhibit 11(A), consisting of two vials of blood purported to be Griffin's blood. During the autopsy, the doctor had removed the two vials of blood from the victim's body and turned them over to a police officer who marked them and took them to a police evidence room. He then mailed them to the Federal Bureau of Investigation in Washington, D.C. where they were received and examined in order to determine whether Griffin's blood matched the bloodstains on the knife.

Appellant claims that a Mr. Gilliland received the vials when they arrived in Washington and turned them over to FBI agent

Babyack, who stated that at the time he received the vials they were not sealed. He performed the necessary tests of the blood, then sealed the tubes and mailed them back to the South Bend police. Both Babyack and Officer Engle of the South Bend police testified that the blood samples and the knife appeared to be substantially in the same condition as they were when they were in the custody of each man. The mere potential for tampering does not make evidence inadmissible.

■ The State is not required to exclude every possibility of tampering. *See Murphy v. State* (1990), Ind., 555 N.E.2d 127; *Delatorre v. State* (1989), Ind., 544 N.E.2d 1379; *Livingston v. State* (1989), Ind., 544 N.E.2d 1364. Where as here, witnesses were able to testify that the evidence was in substantially the same condition at trial as it was when the witness first came in contact with it, it is not error to admit it in evidence. *Murphy, supra.* There was no error in the introduction of State's Exhibit No. 11(A).

■ Appellant claims the trial court erred in imposing such a lengthy sentence. He takes the position that the trial judge enhanced his sentences because he was a drug dealer. Appellant claims he planned to get out of this "sordid business." He also takes issue with the trial court's enhancement concerning the murder of Griffin because of the brutal manner in which Griffin was murdered. He then states that, "There is no evidence that Bibbs died a particularly gruesome death and therefore the court was incorrect in enhancing the sentence in this count." This is a rather remarkable statement in view of the testimony describing Bibbs' injuries.

The evidence shows that Bibbs suffered a contusion on his forehead that was one and one half inches by one inch in size, two superficial lacerations on his right eyelid and eyebrow, and a fractured skull, which created a discoloration around his eyes, all of the injuries above inflicted by a blunt instrument. He also suffered a gunshot wound to the back of his neck, six pellet wounds in the back of his scalp, ear, and neck. Death was caused by a gunshot wound which severed his brain stem. We cannot agree with appellant's statement that Bibbs did not suffer a gruesome death.

When a sentence follows the statute and is appropriate under the facts of the case, this Court will not invade the province of the trial court in its discretionary rendering of sentence. *Bish v. State* (1981), Ind., 421 N.E.2d 608. In the case at bar, the trial judge set out in detail his reasons for imposing the enhanced sentences. In view of the record in this case, we find no abuse of his discretion in the sentence rendered.

■ Appellant claims there is insufficient evidence to support the jury's verdict. He concedes that on appeal this Court does not reweigh the evidence, citing *Case v. State* (1984), Ind., 458 N.E.2d 223. However, he claims that the State's case was based in part on the testimony of Kimberly Whitlock and that because she first said that she had received her injuries as a result of a mugging but later changed her story to coincide with the evidence recited above, the court should treat her testimony as incredible. Whitlock explained that she had claimed at first that she was injured in a mugging because she was afraid of appellant and Lee.

Appellant also points out that at codefendant Lee's trial, Whitlock at first stated she went to Griffin's home to use the telephone, whereas at appellant's trial, she changed her story and said she went to Griffin's home because she wanted drugs. Therefore, her testimony should be deemed to be incredible. This evidence was placed before the jury for their consideration. Although appellant contradicted the testimony of Whitlock, the jury was not obliged to believe his testimony and had the duty to determine what evidence to believe. *Graves v. State* (1984), Ind., 472 N.E.2d 190; *McBrady v. State* (1984), Ind., 459 N.E.2d 719. The trier of fact is free to believe one part of a witness' testimony and disbelieve another part. *Nelson v. State* (1988), Ind., 525 N.E.2d 296. There is ample evidence in this record to support the verdict of the jury.

The trial court is affirmed.

SHEPARD, C.J., and KRAHULIK, J., concur.

DeBRULER, J., dissents with separate opinion in which DICKSON, J., concurs.

DeBRULER, Justice, dissenting.

In *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), inventory searches of automobiles were approved as consistent with the fourth amendment. Thus, no warrant is required for such searches and their incriminating products are admissible. *Rabadi v. State* (1989), Ind., 541 N.E.2d 271. However, the necessary condition for the application of the inventory search rationale is a lawful impoundment by the police of the thing ultimately searched. The essential question presented by appellant's claim that the trial court committed error in permitting the knife and further evidence stemming from that knife to be introduced into evidence by the prosecution is whether appellant's truck, in which the items were found when searched at the station house, was lawfully impounded.

In *Opperman,* a car was towed and impounded after being twice ticketed for illegal parking. A later routine search of the car produced illegal marijuana. The Court held the marijuana admissible, stating in part:

> The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

*Opperman,* 428 U.S. at 369, 96 S.Ct. at 3097, 49 L.Ed.2d at 1005.

In the next case of *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), Ralph Lafayette was subjected to a full custodial arrest for disturbing the peace while carrying a shoulder bag. The bag was impounded and subjected to a warrantless search. The Court stated:

> At the station house, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed.

*Lafayette,* 462 U.S. at 646, 103 S.Ct. at 2609, 77 L.Ed.2d at 71. And in the recent case of *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), Steven Bertine was arrested for driving under the influence, and his van was taken into custody pursuant to express statutory authority in that State and then subjected to an inventory search.

The part of the investigation which produced the search in this case is described in the testimony as follows:

Q  Would you tell the Court, this particular truck—how the police department happened to come in contact with it?

A  They had—it had been spotted initially in the 600 block of LaSalle Street within a day after the homicide investigation started. There had been some periodic surveillance put on that truck and it disappeared and it was located again on the following Monday or Tuesday parked in the 1100 block of Harvey Street. Surveillance was set up on this vehicle after we ascertained through running a license plate check on the vehicle that it was registered to Mr. Foulks. One of the detectives assigned to survey liens noticed the subject come out of a house and start to get into this vehicle. This man was detained and brought down to the police station. The man gave a false name, said that Billy Foulks had given him this truck to use. At that time I felt the man was not telling us the truth as to his identity and whether or not Mr. Foulks had given him the truck to use or not. That was subject to question, so on my authority, I asked that the uniform division impound the truck and take it to the South Bend Police Department and lock it in the SWAT garage. That would have been Tuesday evening.

\*    \*    \*    \*    \*    \*

Q  When these inventory searches are done, are they normally done by somebody like Sergeant Engle?

A  Not normally.

Q  And are vehicles that are impounded, are they normally stored in the SWAT lock-up area?

A  Sometimes they are, yes.

Q  So if somebody gets arrested for drunken driving, their car is put in the SWAT area, is that how it works?

A  No, not normally.

In my opinion, the facts and opinions in this testimony do not justify the impoundment of appellant's car, and therefore its later search at the station house cannot be justified upon the inventory search rationale. It was therefore error, and not harmless constitutional error, for the Court to admit the product of that search.

An arrest warrant had been issued for appellant, and the police were watching for his truck, in order to locate him and serve the warrant.  An arrest warrant authorizes the police to seize the person named in the warrant, and to take such person to the court which issued the warrant, so that he may answer for a crime.  I.C. 35-33-2-2. The impoundment of appellant's truck does not serve the purpose of the warrant and was not therefore authorized by it.  A court cannot sanction the seizure of a vehicle simply because there is an outstanding warrant against its owner.

The truck was lawfully parked on the street.  The public safety did not therefore require that it be towed away and impounded as was the case in *Bertine*.

Finally, the evidence of the fact that the man who was discovered to be using the truck gave a false name when first questioned by the police, does not justify the impoundment.  The man said the truck had been loaned to him by "Billie Foulks" and the police knew that the truck belonged to "Willie Foulks".  The police officer testified that the man was detained and questioned at the police station.  There is no evidence that the suspicions aroused by the lie of the person with respect to his identity led anywhere, much less to his arrest and custody.

DICKSON, J., concurs.